JACKSON, *ex dem.* GARLAND and others, *against* BROWNER.

EJECTMENT to recover part of great lot, No. 4. in *M'Neil's* patent, in the town of *Danube*, tried before Mr. Justice *Yates*, at the *Herkimer Circuit*, in *June*, 1819.

The plaintiff gave in evidence letters patent, dated *August* 15, 1761, to *John M'Neil*, *Alexander Stewart* and others, for a tract of 3,400 acres of land, in *Danube*, including the premises in question ; also, a deed of partition, by which lot No. 4. became the separate property of *M'Neil*.

*George Shall*, a witness of plaintiff, testified, that *M.* the patentee, left this country before the revolutionary war, and went to *Ireland*, where he soon after died. That part of lot No. 4. is held under deeds from the patentee, and part under *Luke Owens*, who claimed an undivided part of the lot, under a deed from *Thomas Garland*, whose mother, as the witness understood from *Owens*, was a sister of *M* the patentee. The witness further stated, that he understood from *Owens* that *M.* had several sisters ; that *Garland*, under whom *Owens* claimed, was a sailor, and had come from *Ireland*. The witness further testified, that the defendant holds part of lot No. 4. under one *Keller*, who claimed under *M'Neil*.

*Alexander M'Kinnon*, another witness for the plaintiff, testified, that he was born in *Ballycastle*, in *Ireland*, and was thirty-three years old ; that he left *Ballycastle* about ten years ago ; that he knew *Daniel M'Clean*, and that his parents were dead. That he frequently heard of *John M'Neil*, in *Ballycastle ;* that he understood from the physician who attended him and others, that *M'Neil* died

*Though hearsay and reputation may be received as evidence to prove pedigree, yet where the witnesses are not connected with the family, have no personal knowledge of the facts of which they speak, and have not derived their information from persons connected or particularly acquainted with the family, but speak generally of what they have heard and understood, such evidence is insufficient for that purpose.*

NEW-YORK, many years before the witness's recollection; that he had
May, 1820. frequently seen the house in which *M'Neil* died; that he
JACKSON understood that he left no children, and had four sisters,
v.
BROWNER. one of whom married *M'Clean,* one married *M'Clister,*
another *O'Hale,* and another married *Garland.* That he
understood that *D. M'Clean* was the son of a sister of
*M'Neil.* That Mrs. *M'Clister* had a son named *John;*
that Mrs. *O'Hale* died without issue, and Mrs. *Garland* had
two children named *Thomas* and *Mary.* The witness fur-
ther stated, that he knew *Garland;* that he lived in *Bally-
castle,* and was a sailor in the latter part of his life. That
before the witness left *Ireland,* he understood from
*M'Clean* and the other heirs of *M'Neil,* that they owned
lands in this country, as heirs of *M'Neil.* That when he
left *Ireland,* he was entrusted by the heirs of *M'Neil* with
a pacquet of papers, directed to Mr. *Hill* of *Albany,* which
he understood related to their lands in this country.

*Ezekiel M'Kinnon,* another witness, testified, that he un-
derstood that *John M'Neil* died without children, and had
four sisters, who were married, to wit, Mrs. *M'Clean,* Mrs.
*M'Clister,* Mrs. *O'Hale,* and Mrs. *Garland.* That he knew
*Daniel M'Clean* a lessor, and understood that he was the
son of a sister of *M'Neil.* That he knew *Thomas Garland,*
the son of another sister of *M'Neil;* and that they claimed
lands in this country, as heirs of *M'Neil,* before the wit-
ness left *Ireland.*

*Francis Henry,* a witness for the plaintiff, testified, that
two adjoining patents of land in the county of *Otsego,*
granted to *John M'Neil, Alexandar Stewart,* and others, are
held and occupied under a title derived from the heirs of
*Stewart,* and under a title derived from *Daniel M'Clean,*
*Thomas Garland* and others, the reputed heirs of *John
M'Neil,* who died in *Ballycastle* in *Ireland.*

The plaintiff having rested his cause, the Judge decided,
that there was not evidence sufficient to support the action,
and directed a nonsuit to be entered, with liberty to the
plaintiff to move to set it aside.

*Brown,* for the plaintiff.

*Ford,* for the defendant.

NEW-YORK,
May, 1870.

JACKSON
v.
BROWNER.

SPENCER, Ch. J. delivered the opinion of the Court. Mr. Justice *Le Blanc,* in *Higham* v. *Ridgeway,* (10 *East,* 120.) lays down the rule of evidence in cases of pedigree with perspicuity, and places it on a reasonable ground. He considers it as a departure from the strict rules of evidence, on account of the great difficulty of proving remote facts in the ordinary way, by living witnesses; " and on this ground," he says, " hearsay and reputation (which latter is the hearsay of those who may be supposed to have known the fact, handed down from one to another) have been admitted as evidence in cases of pedigree." " The tradition" said Lord *Eldon,* in *Whitelock* and *Baker,* (13 *Vesey,* 514.) " must be from persons having such a connexion with the party to whom it relates, that it is natural and likely, from their domestic habits and connexions, that they are speaking the truth, and that they could not be mistaken.

In this case, the point was, whether the lessors of the plaintiff were the heirs of *John M'Neil.*

*John M'Neil* left this country before the revolution, and went to *Ireland,* where he soon after died ; of these facts there is sufficient proof. Part of great lot No. 4. (and the premises are in that lot) is held under deeds from *John M'Neil,* who was the patentee. A part is held under *Luke Owens,* who claimed an undivided part of the lot under a deed from *Thomas Garland.* The witness (*Shall*) then proceeded to state that *Owens* had informed him that the mother of *Garland* was a sister of *M'Neil,* and that he had a number of sisters. It does not appear that *Owens* is dead, or that he knew, or professed to know, the facts he stated, from any connexion or acquaintance with *M'Neil's* family, or his sisters. In that respect, *Owen's* declarations are of no weight, and to admit them as evidence would be contrary to every rule of evidence. *Alexander M'Kinnon* says, he was born in *Ballycastle* in *Ireland,* which he left about ten years ago. That he knew the lessor, *Daniel M'Clean;* that his father and mother are dead; that he has frequently heard of one *John M'Neil,* in *Ballycastle ;* that he understood from the physician who attended him, and others, that

he died before the witness's recollection, and that he has often seen the house where he died; that he understood, that *John M'Neil* left no children; that he understood, that he had four sisters, one of whom married *M'Clean*, one married *O'Hale*, and one married *Garland*; and he understood that *Daniel M'Clean* was the son of a sister of *John M'Neil.* &c. *Ezekiel M'Kinnon's* testimony is to the same purport.

Now, the radical defect in all this evidence is, that the witnesses are not themselves connected with these families, know nothing personally of the facts to which they speak, and have not derived their information from such persons as had any connexion or particular acquaintance with the family from which *John M'Neil* sprang. All that they state is loose hearsay from some unknown source. Since 1765, *John M'Neil* must have returned to *Ireland;* for in *September* of that year, the deed of partition was executed. His death, therefore, is not at so remote a period, but that in all probability there are living witnesses capable of informing us who his heirs were. At all events, the proof here is entirely inconclusive. The evidence falls short, in material respects, of giving any thing but unfounded hearsay, derived from we know not whom.

Motion denied.